Not for Publication

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ADOLPHUS NWOKEDI, | |
| Petitioner, | Civil Action No.: 19-00263 (ES) |
| v. | OPINION |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

SALAS, DISTRICT JUDGE

Before the Court is *pro se* petitioner Adolphus Nwokedi's ("Petitioner") amended motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (D.E. No. 3 ("Amended Motion" or "Am. Mot.")). At the time he filed his Amended Motion, Petitioner was incarcerated at MDC Brooklyn, Brooklyn, New York. Respondent United States of America ("Respondent") answered the Amended Motion. (D.E. No. 19 ("Resp.")). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court **DENIES** the Amended Motion and **DENIES** a certificate of appealability.

## I.    BACKGROUND

On April 16, 2015, a federal grand jury returned a one-count indictment against Petitioner. (Crim. No. 15-177, D.E. No. 15). The count charged that, between (approximately) October 2013 and (approximately) January 2014, Petitioner knowingly and intentionally conspired and agreed with others to import into the United States from a place outside the United States, i.e., India, 100 grams or more of a mixture and substance containing a detectable amount of heroin (a Schedule I

controlled substance), contrary to 21 U.S.C. §§ 952(a) and 960(b)(2)(A) and in violation of 21 U.S.C. § 963. (*Id.* at 1).

On December 8, 2015, the Court began a jury trial. (Crim. No. 15-177, D.E. No. 27). In its opinion denying Petitioner's motion for a judgment of acquittal and a new trial under Federal Rules of Criminal Procedure 29 and 33, the Court provided the following summary of the evidence adduced at trial:

> On October 24, 2013, Nwokedi sent an international text message to an individual named "Mary Jane" that identified his home address in Sayreville, New Jersey. (Government Exhibit ("GX") 309 at 1; GX 601 at 1; 12/9/15 Tr. at 52:16-53:16). On November 1, 2013, Mary Jane sent a text message to Nwokedi containing a tracking number for a parcel shipped from India. (GX 106; GX 309 at 1; GX 601 at 1; 12/9/15 Tr. at 8:24-9:22, 147:19-148:14). This parcel was shipped from Mumbai, India to Nwokedi's home, and, on November 12, 2013, Nwokedi signed for it. (GX 106; 12/9/15 Tr. at 8:24-10:15, 147:19-148:14).
>
> On December 1, 2013, Nwokedi sent a text message to Mary Jane with his business address—i.e., "Ebube motors" located at 180 Poinier Street in Newark, New Jersey. (GX 309 at 2; GX 601 at 4; 12/9/15 Tr. at 149:1-15). On December 6, 2013, a second parcel (the "parcel-at-issue") was shipped from Mumbai, India. (GX 105; 12/9/15 Tr. at 10:16-11:17). This parcel was intended for Nwokedi's Poinier Street business address in Newark, and the phone number for the intended recipient was associated with Nwokedi. (GX 102; GX 105; GX 105A; GX 105B; 12/9/15 Tr. at 37:5-13, 52:16-53:4, 57:23-59:9). The parcel-at-issue had printed on it, among other things, the intended recipient as "Ebube motors." (*See* GX 102).
>
> But, on December 11, 2013, a Customs and Border Protection ("CBP") officer at John F. Kennedy Airport intercepted the parcel-at-issue. (GX 101; GX 105; 12/8/15 Tr. at 32:4-33:20). The CBP officer opened it and discovered bags containing powder that were ultimately determined to be—based on three separate preliminary chemical tests—narcotics, opiates, and heroin. (12/8/15 Tr. at 33:21-37:6). Further testing by a CBP chemist determined that the powder was heroin and the net weight was approximately 502 grams. (GX 109; 12/9/15 Tr. at 23:18-25:10, 29:14-31:20). The chemist, however, did not determine the percentage of heroin in the packages—i.e., the actual purity of the heroin. (*See* 12/9/15 Tr. at

34:11-35:2).   Homeland Security Investigations ("HSI") agents photographed the parcel-at-issue and its contents, including the bags of heroin.   (*See* GX 102).   The seized heroin was inadvertently destroyed before trial.  (12/9/15 Tr. at 176:24-177:9).

On December 12, 2013, Nwokedi sent a text message to an individual named Samuel Soremekun.  (GX 310 at 1; GX 601 at 4; 12/9/15 Tr. at 62:22-63:1).   Soremekun was Nwokedi's business associate at the Poinier Street location.  (12/9/15 Tr. at 55:1-57:9). In the message, Nwokedi asked Soremekun to receive the parcel-at-issue on behalf of Ebube Motors.  (GX 310 at 1; GX 601 at 4; 12/9/15 Tr. at 62:13-63:1).  On December 16, 2013, Mary Jane sent a text message to Nwokedi inquiring why Nwokedi was not answering his phone.  (*See* GX 601 at 6).

HSI agents then conducted two controlled deliveries of the parcel-at-issue.  (12/9/15 Tr. at 112:14-117:22).  Importantly, during the second controlled delivery on December 17, 2013, HSI agents delivered the parcel-at-issue to Soremekun who recognized Ebube Motors as a company belonging to Nwokedi.  (*Id.* at 54:2-14, 58:10-60:4, 116:1-117:13).   Soremekun signed for the parcel-at-issue, explaining that he routinely signed for parcels intended for Nwokedi because Ebube Motors was Soremekun's client.  (*Id.* at 56:11-60:4). And Soremekun testified that Nwokedi specifically had asked him to sign for the parcel-at-issue a few days before the December 17 controlled delivery.  (*Id.* at 59:24-63:1; *see also* GX 310 at 1).  After Soremekun signed for the parcel-at-issue, law enforcement approached and interviewed Soremekun "to determine his involvement" with the parcel.  (*See* 12/9/15 Tr. at 116:1-118:23).

While Soremekun was speaking to HSI agents, Nwokedi called Soremekun and left him a voicemail.  (*See* GX 201; 12/9/15 Tr. at 65:19-66:6, 70:6-72:4).   On the voicemail, Nwokedi told Soremekun that he was out of the country and asked that Soremekun receive the parcel-at-issue on Nwokedi's behalf because he did not want it to get returned while he was out of the country.  (*Id.*).

Soremekun then texted Nwokedi that he had received the parcel-at-issue.  (GX 310 at 2; 12/9/15 Tr. at 72:5-73:3).  Nwokedi forwarded Soremekun's text message confirming receipt of the parcel-at-issue to Mary Jane.  (GX 601 at 6).  Mary Jane then texted Nwokedi the following: "good luck."  (*Id.*).

Soremekun agreed to help law enforcement coordinate a meeting with Nwokedi.  (12/9/15 Tr. at 73:7-9).   Thereafter, Nwokedi sent Soremekun text messages that concerned, among

other things, the parcel-at-issue. (GX 601 at 6-11). During this same timeframe, Nwokedi received calls and text messages from Mary Jane and an individual named "Chuks." (*Id.*). As Nwokedi himself would later testify, Chuks was supposed to be the ultimate recipient of the parcel-at-issue. (12/9/15 Tr. at 143:18-145:12).

On January 2, 2014, Soremekun and Nwokedi met in the parking lot of the Poinier Street address in Newark. (*Id.* at 127:9-129:19). Nwokedi took the parcel-at-issue from Soremekun. (*Id.* at 129:20-23). Nwokedi was then arrested and taken into custody. (*Id.* at 129:24-25).

An HSI special agent testified that, during his subsequent post-arrest interview, Nwokedi stated he was a businessman and shipped cars for profit, primarily to Africa. (*Id.* at 138:2-8). The special agent testified that he first stated that the parcel-at-issue had car mirrors that he purchased from eBay, Inc. for a Mercedes Benz he was going to ship to a friend named "Tony" in Nigeria. (*Id.* at 138:12-141:8; *see also* 12/10/15 Tr. at 15:3-15 (Nwokedi testifying that Tony was a customer and a friend of his)). In particular, [the] special agent testified that Nwokedi said the parcel-at-issue had been sent from India and he bought the mirrors on eBay. (12/9/15 Tr. at 140:19-25). The special agent further testified that Nwokedi's "story kind of started changing a little bit" and that Nwokedi told the agents that his friend, Mary Jane, had sent him the parcel-at-issue. (*Id.* at 141:13-142:3).

But, after HSI agents told Nwokedi that the parcel-at-issue had heroin, the special agent testified Nwokedi told the agents he had agreed to receive this parcel from Mary Jane and was going to be paid $3,000 to deliver it to "Chuks" in New York. (*Id.* at 143:18-145:12, 151:16-21). The special agent also testified that Nwokedi "kind of slumped over a little bit, looked to me like his eyes may have welled up a bit," that "[h]e didn't say much for a short time," and "then he admitted that he knew that in [sic] were drugs in that box." (*Id.* at 143:18-25). The special agent also testified that Nwokedi told the agents that Mary Jane used a code word, "market," to refer to the contents of the parcel-at-issue. (*Id.* at 144:13-144:20). The special agent testified that Nwokedi understood this word to mean narcotics. (*Id.*).

Nwokedi then agreed to help HSI agents to effect a controlled delivery to Chuks. (*See id.* at 153:2-158:25). But Chuks never followed up with Nwokedi about a meeting location, which was part of the reason the controlled delivery never took place. (*See id.* at 159:11-19).

4

*United States v. Nwokedi*, No. 15-177, 2016 WL 7015626, at *1–3 (Dec. 1, 2016) (footnotes omitted).[1]

On cross-examination, the HSI special agent (Andrew Danchuk) admitted that he did not take notes of Petitioner's interview or have Petitioner "write any of this down." (12/9/15 Tr. at 160:20–21, 166:17–19). Special Agent Danchuk also conceded that he did not receive any specific training in taking written statements from a witness or suspect, the interview room was not set up for audio or video recording in January 2014 when Petitioner was questioned (although the room is now set up with such equipment), the agents recorded Petitioner's phone conversation with Chuks, and there was equipment available at the time to record the post-arrest interview. (*Id.* at 166:20–168:14). Special Agent Danchuk indicated that he would have been in touch with the Assistant United States Attorney when Petitioner was questioned concerning the case. (*Id.* at 167:1–4). According to Special Agent Danchuk, it would have been helpful to have an audio or video recording of "just what" Petitioner said, and "[i]t would be hard to contest it [the confession] if you were on audio or video confessing." (*Id.* at 167:18–21, 168:23–169:4). Special Agent Danchuk may have testified in other cases where the defendant later claimed they never confessed and where there was similarly no recording of their confession. Special Agent Danchuk referred to a policy change by the Department of Justice ("DOJ") that was implemented after he had questioned Petitioner, which required (for the first time) that custodial interviews be recorded. (*Id.* at 168:16–22).

---

[1]    The Court's December 1, 2016 Opinion "refers to trial transcripts as '12/__/15 Tr.' available at Docket Entry Nos. 40-43." *Nwokedi*, 2016 WL 7015626, at *1 n.3. It also identified the respective "Government's Exhibit" as "GX." *Id.* at *1. The Court uses the same formatting in the present Opinion.

With respect to Petitioner's post-arrest interview, the Court noted that Petitioner was advised of and waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and consented to the search of his cell phone. *Nwokedi*, 2016 WL 7015626, at *2 n.4 (citing GX 107; GX 108; 12/9/15 Tr. at 132:3–137:1).

In his testimony on cross-examination, Special Agent Danchuk indicated that Petitioner's cell phone was monitored to see if Chuks called back but that Chuks did not call. (*Id.* at 172:14–21). However, Special Agent Danchuck appeared to acknowledge that the device was not continuously monitored (and that instead the device was put into evidence and checked when it "came out of evidence"). (*Id*. at 172:25–173:25). It is undisputed that "Chuks did call [Petitioner] back the next morning" (Am. Mot. at 22 n.10 (citing GX 305 at 150)), and that the agents "fail[ed] to follow up with investigating Chuks" (Resp. at 29 (citing 12/9/15 Tr. at 171–75)).

Petitioner also testified and specifically disputed Special Agent Danchuk's account of the post-arrest interview. According to Petitioner, Tony was a customer who had bought cars from Petitioner and stayed at Petitioner's home. (12/10/15 Tr. at 15:3–16:2). Petitioner denied knowing Chuks and testified that the logged communications with Chuks resulted from Tony using Petitioner's cell phone. (*Id.* at 17:7–18:9). With respect to the first parcel, Petitioner stated that the package was for Tony and contained nothing more than legal documents. (*Id.* at 16:5–17:16). With respect to the second parcel (the parcel-at-issue), Petitioner said that Mary Jane (Tony's cousin) told him she wanted to buy a car and that she had "market to sell in New York." (*Id.* at 21:14–22:25). Petitioner explained that "market" means goods to sell. (*Id.* at 22:17–23). He denied knowing there were drugs in the parcel-at-issue. (*Id.* at 38:12–14).

Petitioner testified that he told Soremekun that there were car parts in the parcel because he wanted Soremekun to believe that the parcel was related to a car Petitioner was going to ship, which, in turn, might encourage Soremekun to cooperate and hand over the package to Petitioner because Petitioner would soon have the money to pay the outstanding balances he owed to Soremekun. (*Id.* at 31:2–32:14). Petitioner purportedly told this same lie about car parts to the HSI special agents because he was scared. (*Id.* at 33:17–34:3).

According to Petitioner, he urinated when he was tackled and handcuffed during his arrest, and he was scared and shivering during the post-arrest interview.[2]  (*Id.* at 33:2–34:10).  Petitioner disavowed his confession, denying that he ever told the agents that he knew there were drugs in the parcel-at-issue.  (*Id.* at 13:23–14:4).

On cross-examination, Petitioner admitted that, from the end of November 2013 through early January 2014, Tony was not using Petitioner's cell phone; instead, during this time period, Petitioner used this phone to communicate with Chuks via phone calls and text messages.  (*Id.* at 41:9–42:7, 67:6–13, 68:11–18; GX 601 at 6–12).  Petitioner further admitted that, by the time he falsely told Soremekun there were car parts in the parcel-at-issue, Soremekun had already signed for the parcel.  (12/10/25 Tr. at 62:5–10).  Accordingly, Petitioner agreed that "there [was] no reason to lie" about the car parts.  (*Id.* at 62:11–13).  Petitioner was asked why he told the same lie about car parts to the agents, and he responded "I don't know what to say."  (*Id.* at 73:12–14).

After the Government's case-in-chief concluded, Petitioner moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  (*Id.* at 5:8–11).  The defense requested a judgment of acquittal on the grounds that: (i) the drugs that were allegedly seized in this case were destroyed prior to trial and accordingly "they were 'not here for the jury to see'"; and (ii) there was "a 'lack of evidence' because the Government's case was based [on] 'circumstantial evidence of phone calls and text messages' that 'are equally explainable with an innocent explanation' and 'an alleged confession' that a 'rational trier of fact could [not] credit[ ] under the circumstances and what we have learned about that from the trial.'"  *Nwokedi*, 2016 WL 7015626, at *3 (quoting 12/10/15 Tr. at 5:14–20, 5:21–6:7).  The Court reserved ruling on the motion, and Petitioner renewed the motion after the defense's case-in-chief.  (12/10/15 Tr. at 6:10–8:1, 81:3–12).  The

---

[2]      It is undisputed that a portion of Petitioner's testimony was "mis-transcribed as 'I feel my body.'"  (Resp. at 10 n.3).

Court again reserved ruling on the motion. (*Id.* at 81:3–12).

On December 11, 2025, the jury found Petitioner guilty on the conspiracy charge. (Crim. No. 15-177, D.E. No. 30).

The Court then received correspondence from Petitioner expressing his dissatisfaction with his trial counsel and requesting a new attorney. *Nwokedi*, 2016 WL 7015626, at *3; (Am. Mot., Ex. 1 ("December 23, 2015 Letter" or "Dec. 23, 2015 Ltr.")). On January 18, 2016, the Court appointed new counsel for Petitioner. (Crim. No. 15-177, D.E. No. 44). On June 6, 2016, Petitioner's new attorney moved for a judgment of acquittal and a new trial. (Crim. No. 15-177, D.E. No. 46).

The Court denied Petitioner's motion for acquittal and a new trial on December 1, 2016. (Crim. No. 15-177, D.E. No. 59); *Nwokedi*, 2016 WL 7015626, at *1.

In its opinion, the Court first considered Petitioner's argument that the Government acted in bad faith "for the following reasons: (1) the only evidence regarding his involvement was his admission, but this was never recorded or memorialized; and (2) he had no opportunity to test or weigh the drugs—which were inadvertently destroyed by the Government." *Nwokedi*, 2016 WL 7015626, at *4 (citing Crim. No. 15-177, D.E. No. 46 at 6–11). The Court rejected both reasons. *Id.* at *5–7. With respect to Petitioner's acquittal motion, it noted that there is no authority requiring the Government to record Petitioner's post-arrest statement. *Id.* at *5. Furthermore, the Court determined that, given Special Agent Danchuk's testimony describing Petitioner's post-arrest confession and the circumstantial evidence involving Petitioner's numerous communications regarding the parcel-at-issue and his efforts to coordinate its delivery, a rational finder of fact could conclude that Petitioner agreed with others to import a controlled substance into the United States from India knowing that the purpose of such agreement was to effectuate

such importation. *Id.* The Court further determined that, to rule in Petitioner's favor, it would have to find that Special Agent Danchuk lied and thereby usurp the role of the jury, which it cannot do on a motion for an acquittal:

> After all, to find otherwise would be tantamount to setting aside the jury's consideration of Nwokedi's post-arrest confession that HSI Special Agent Danchuk recounted in his testimony and accepting Nwokedi's assertion that this agent lied, (*see* 12/9/15 Tr. at 143:18- 145:12, 151:16-21; 12/10/15 Tr. at 75:3-8, 75:20-25), as well as setting aside the circumstantial evidence involving Nwokedi's numerous communications about the parcel-at-issue and efforts to coordinate delivery of this parcel. This Court cannot usurp the role of the jury. *See* [*United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006)] ("As we have made clear, a court must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." (internal quotation marks and citations omitted)); *see also United States v. David*, 222 [F. App'x] 210, 214 (3d Cir. 2007) (explaining that "issues of witness credibility ... are strictly within the province of the jury" and the jury "has authority to credit all, none, or any part of the evidence properly before it").

*Id.*

Likewise, the Court was unconvinced that a new trial was warranted because, in addition to the special agent's testimony concerning Petitioner's role in receiving the parcel-at-issue from Mary Jane and getting paid to deliver it to Chuks, as well as Petitioner's understanding that the parcel-at-issue contained narcotics, Petitioner's cross-examination "revealed telling inconsistencies":

> In particular, Nwokedi testified that he didn't know Chuks and that the logged communications with Chuks resulted from Tony using Nwokedi's phone. (*See* 12/10/15 Tr. at 17:17-18:9). But he then admitted on cross-examination that—during the critical period at the end of November 2013 through early January 2014—Tony was *not* using Nwokedi's phone. (*See id.* at 41:9-42:7, 67:6-13, 68:11-18). And it was during this time period that Nwokedi exchanged calls and text messages with Chuks. (*See* GX 601 at 6-12)[.]

*Id.* at *6 (citation omitted).  "For example, there were two incoming calls from Chuks to Nwokedi on December 27, 2013 (one which lasted two minutes and one which lasted three minutes)."  *Id.* at *6 n.6 (citing GX 601 at 6–7).

The Court also considered and rejected Petitioner's challenges to the Court's willful blindness instruction.  *Id.* at *7–12.  It observed that the record contained evidence supporting this instruction, noting that Special Agent Danchuk testified that, during the post-arrest interview, Petitioner acknowledged that the parcel-at-issue was valuable and that he would be paid $3000 once he delivered the parcel to Chuks in New York.  *Id.* at *9.  Furthermore, Petitioner admitted that he told Soremekun there were car parts in the parcel even though Petitioner knew the parcel did not contain such parts, and Petitioner subsequently repeated the same lie to law enforcement.  *Id.*

On December 8, 2016, the Court conducted a sentencing hearing.  (Crim. No. 15-177, D.E. No. 65 ("12/8/16 Tr.")).  At his sentencing, Petitioner proclaimed his innocence, emphasizing the lack of any recording of his post-arrest interview and claiming that the Government failed to pursue Chuks.  (*Id.* at 15:21–18:6).  The Court, however, found, based on its review of the record, that there was no reason to doubt the jury's findings or the special agent's "incredibly credible" testimony.  (*Id.* at 18:21–20:1).  According to the Court, "despite the fact that [Petitioner's] confession was not recorded," the jury "relied on the testimony collectively that was provided in the government's case in chief" and found him guilty.  (*Id.* at 20:9–18).  The Court sentenced Petitioner to 63 months' imprisonment and a four-year term of supervised release.  (Crim. No. 15-177, D.E. No. 61).

Petitioner filed a notice of appeal on December 13, 2016.  (Crim. No. 15-177, D.E. No. 63).

On September 11, 2017, the United States Court of Appeals for the Third Circuit affirmed the criminal judgment. *See United States v. Nwokedi*, 710 F. App'x 91 (3d Cir. 2017). Specifically, the Third Circuit addressed Petitioner's argument that his conviction cannot stand because the Government acted in bad faith by destroying the heroin and failing to record his confession. *Id.* at 93–94. According to the Third Circuit, because this claim implicated a "defect in instituting the prosecution" pursuant to Federal Rule of Criminal Procedure 12(b)(3)(A), it had to be raised before trial and otherwise cannot be considered absent good cause. *Id.* at 93. "Although Nwokedi knew prior to trial that the heroin was destroyed, he neither raised the issue in the District Court nor has he argued on appeal that good cause existed for his failure to do so. Accordingly, we hold this claim forfeited." *Id.*

Furthermore, the Third Circuit stated that, even if he timely objected, Petitioner's bad faith argument would have failed because there is no per se rule requiring confessions to be recorded. *Id.* at 93 n.2. In addition, it rejected Petitioner's similar contention that the destruction of the drugs and the absence of a recorded confession rendered the evidence insufficient to support the conviction. *Id.* at 93–94. "Although the jury was free to believe Nwokedi's testimony that he never confessed, the jury was equally free to find the agent's testimony to the contrary more credible. Nor was it irrational for the jury to find Nwokedi guilty based on the circumstantial evidence presented at trial." *Id.* at 94. In addition, the Third Circuit rejected Petitioner's multiple challenges to the Court's willful blindness jury instruction. *Id.*

The Supreme Court denied Petitioner's petition for a writ of certiorari on January 8, 2018. *Nwokedi v. United States*, 583 U.S. 1082 (2018).

On January 1, 2019,[3] Petitioner filed a placeholder motion to vacate, which was docketed

---

[3]    *See Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998) (holding that a *pro se* prisoner's habeas petition is deemed filed at the moment he delivers it to prison officials for mailing to the district court).

in the present matter.  (D.E. No. 1).  Petitioner stated that he would be filing an amendment and supporting documents within 30 days (*id.* at 2); however, his submission, which was filed on January 7, 2019, was inadvertently docketed as a new case (and, in any event, Petitioner did not use the correct form).  (Civ. No. 19-953, D.E. No. 1).  The Court administratively terminated Civil Action No. 19-953 because Petitioner failed to use the correct form, and, on March 5, 2019, Petitioner filed the Amended Motion (on the correct form), which was docketed as a third civil matter.  (*See* Civ. No. 19-953, D.E. No. 3; Civ. No. 19-8378, D.E. No. 1).  On March 29, 2019, the Court directed the Clerk of Court to file the Amended Motion in the present matter and closed the other two matters.  (*See* D.E. No. 2 at 2).

In his Amended Motion (D.E. No. 3), Petitioner raises three grounds for relief: (i) "The Government proffered false testimony from Agent Danshuk [sic] as to Nwokedi's Alleged Confession;" (ii) "Trial counsel rendered ineffective assistance by failing to investigate and interview witnesses;" and (iii) "Trial Counsel rendered ineffective assistance by failing to investigate defenses."  (Am. Mot. at 5–6, 8).

On October 29, 2019, the Court ordered Respondent to file a full and complete answer to the Amended Motion (D.E. No. 10), and, after receiving two extensions of time (D.E. Nos. 14, 18), Respondent's answer was filed on April 10, 2020 (D.E. No. 19).  Respondent attached two documents to its answer: (i) the colloquy checklist presented by the Court to Petitioner's trial counsel to review with his client to ensure that Petitioner understood the voluntary and informed nature of his decision to testify (D.E. No. 19-1); and (ii) a declaration executed by Petitioner's trial counsel disputing Petitioner's ineffectiveness allegations (D.E. No. 19-2).

Petitioner requested, and was granted, three extensions of time to file a reply.  (D.E. Nos. 20–25).  However, as of the date of this Opinion, Petitioner has not filed a reply.

On March 29, 2022, the Court entered a notice of call for dismissal pursuant to Local Civil Rule 41.1(a), and, on April 13, 2022, the Court dismissed this matter without prejudice.  (D.E. Nos. 30–31).  On May 6, 2022, Petitioner requested the reinstatement of his case.  (D.E. No. 32). The case was reopened on May 9, 2022.  Petitioner filed an identical copy of his Amended Motion on October 20, 2022.  (D.E. No. 33).

## II.    LEGAL STANDARD

Section 2255(a) provides that:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

Unless the moving party claims a jurisdictional defect or a constitutional violation, the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, (or) an omission inconsistent with the rudimentary demands of fair procedure."  *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *United States v. Timmreck*, 441 U.S. 780, 783 (1979)); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458–59 (D.N.J. 2003).  "Section 2255 generally 'may not be employed to relitigate questions which were raised and considered on direct appeal.'"  *United States v. DeRewal*, 10 F.3d 100, 105 n.4 (3d Cir. 1993) (quoting *Barton v. United States*, 791 F.2d 265, 267 (2d Cir. 1986)).  A § 2255 motion cannot be used as a substitute for a direct appeal, and accordingly "[a] habeas petitioner is typically barred from collaterally attacking his conviction or sentence using issues that could have been brought on appeal but were not."  *Salgado v. United States*, No.

24-0322, 2024 WL 5244386, at *3 (D.N.J. Dec. 30, 2024) (citing *Muhammad v. United States*, No. 20-15606, 2022 WL 445623, at *3 (D.N.J. Feb. 14, 2022)).  "Where a petitioner has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised [on collateral review] only if he 'can prove either that he is actually innocent of the crime for which he was convicted, or that there is a valid cause for the default, as well as prejudice resulting from the default.'"  *Id.* (quoting *Hodge v. United States*, 554 F.3d 372, 379 (3d Cir. 2009)).  A district court must hold an evidentiary hearing on a § 2255 motion unless the "motion and the files and records of the case conclusively show" that the movant is not entitled to relief.  *Id.* § 2255(b); *see also United States v. Booth*, 432 F.3d 542, 545–46 (3d Cir. 2005).

*Pro se* filings must be liberally construed in favor of the *pro se* litigant.[4]  *See James v. New Jersey*, No. 24-8271, 2024 WL 4212192, at *2 (D.N.J. Sept. 17, 2024).

## III.    DISCUSSION

### A.    Ground One: Respondent Proffered False Testimony from Special Agent Danchuk as to Petitioner's Alleged Confession

First, Petitioner claims that Respondent presented false or perjured testimony from Special Agent Danchuk regarding Petitioner's alleged confession.  (Am. Mot. at 5).  "The Supreme Court has long held that the [Government's] knowing use of perjured testimony to obtain a conviction" constitutes a due process violation.  *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004) (citations omitted).  "The same is true when the government, although not soliciting false evidence, allows it to go uncorrected when it appears at trial."  *Id.* (quoting *United States v. Biberfeld*, 957

---

[4]      At the time he commenced this proceeding, Petitioner was serving the sentence imposed by this Court at MDC Brooklyn.  (*See* Am. Mot. at 2).  It appears that he has since been released from Bureau of Prisons ("BOP") custody and has completed his term of supervised release.  *See Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited August XX, 2025) (BOP Register Number 66295-050); (Crim. No. 15-177, D.E. No. 80).  "The completion of petitioner's sentence does not moot the 2255 Motion, however, because a conviction is presumed to have continuing collateral consequences."  *Burks v. United States*, No. 23-4082, 2024 WL 4751244, at *2 n.3 (D.N.J. Nov. 8, 2024) (citing *Sibron v. New York*, 392 U.S. 40, 57–58 (1968)).

F.2d 98, 102 (3d Cir. 1992)).  To establish a due process violation, Petitioner must show that "(1) [the witness] committed perjury; (2) the Government knew or should have known of [the witness's] perjury; (3) [the witness's] testimony went uncorrected; and (4) there is a reasonable likelihood that the false testimony could have affected the verdict." *United States v. Hoffecker*, 530 F.3d 137, 183 (3d Cir. 2008) (citing *Lambert*, 387 F.3d at 242).  "A witness commits perjury if he or she 'gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *Id.* (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

Petitioner disputes the veracity of Special Agent Danchuk's testimony that Petitioner told him that "'market' was the code [word] that Nwokedi and Mary Jane used to discuss the alleged drugs" in the parcel-at-issue and that "Nwokedi confessed his role in the offense." (Am. Mot. at 38).  Petitioner emphasizes Special Agent Danchuk's failure to record, write down, or otherwise document Petitioner's statement. (*Id.* at 36–43).  According to Petitioner, his alleged confession was as "convenient as it is impossible" because, although federal law enforcement investigative guidelines and case law require that witness and target interviews, both custodial and non-custodial, be memorialized by memoranda, Special Agent Danchuk, who had twenty-seven years of law enforcement experience and was in contact with an Assistant United States Attorney, took no notes and did not later memorialize this critical interview. (*Id.* at 36–37).  In support, Petitioner cites to the DOJ's *Criminal Resources Manual*, stating that, "generally speaking, witness interviews should be memorialized by the agent." (*Id.* at 36 (citing Dep't of Justice, *Criminal Resources Manual* § 165 (2016) ("DOJ *Criminal Resources Manual*" or "DOJ *Crim. Res. Manual*"))).  Similarly, "[s]ince May 2014, five months after Nwokedi's arrest, the Dept. of Justice policy established a presumption in favor of recording all confessions electronically, with a

recommendation that the practice be extended to interviews as well." (*Id.* at 37 (citing D.E. No. 3 Ex. 2 ("May 12, 2014 DOJ Memorandum" or "May 12, 2014 DOJ Mem.") at 60–68)).

Petitioner points to other alleged deficiencies or inconsistencies in Special Agent Danchuk's testimony such as that his heritage as a child of European immigrants made him especially skilled at understanding heavily-accented English "is palpable nonsense"; that Special Agent Danchuk did not recall from whom Petitioner allegedly said he would get the money for delivering drugs, and he was not sure whether anyone was checking Petitioner's phone to see if Chuks called back or whether there was any follow up as to the Chuks (and, in fact, Chuks did call back the next morning but Respondent failed to follow up and potentially catch Chuks); and that Special Agent Danchuk did not recall what Petitioner may have said about Tony's involvement. (*Id.* at 38–39 & nn.9–10). Specifically, Petitioner states Special Agent Danchuk purportedly "tripped on his fanciful description of what Nwokedi said about Tony" (e.g., he testified that Tony and Petitioner were friends but Tony still had to ask for Petitioner's cell phone number to provide the number to Mary Jane). (*Id.* at 39–40). Petitioner contrasts Special Agent Danchuk's "fuzzy" testimony with his supposed "total recall" regarding the details of Petitioner's alleged confession. (*Id.*).

According to Petitioner, the assertion that Petitioner admitted that "market" was a code word for illegal drugs was false because Petitioner testified that, in Nigerian culture, "market" merely refers to goods that are bought and sold in commercial trade; the presentence investigation report ("PSR") confirmed this meaning of the term by stating that, according to Petitioner and his wife, Petitioner's parents were "the king and queen" of a market in Nigeria with land and buildings and growing mangoes; and the comprehensive Drug Enforcement Administration ("DEA") reference work on drug slang terms and code words (to which Special Agent Danchuk had access)

16

does not list "market" as a slang term for illegal substances. (*Id.* at 40–41 (first quoting PSR ¶ 61; and then citing *DEA Intelligence Report: Slang Terms and Code Words: A Reference for Law Enforcement Personnel* (DEA-HOU-DIR-022-18, July 2018))). Petitioner asserts that, without the alleged confession, nothing in the record suggested that Petitioner was anything other than an "unwitting dupe in the daisy-chain transportation from Mary Jane to whomever Chuk would be delivering it." (*Id.* at 41).

Respondent contends that Petitioner's claim should be dismissed because he failed to raise the issue of Respondent knowingly presenting false testimony at trial or on direct appeal. (Resp. at 17–18). Respondent further argues that Petitioner's claim fails on the merits because he has presented no evidence beyond pure speculation that any part of Special Agent Danchuk's testimony was false and, even if Petitioner were to present some proof indicating that the special agent provided false testimony, there is no evidence that Respondent knew about it. (*Id.* at 19–20). The Court agrees with Respondent that this claim is both procedurally defaulted and fails on the merits.

On direct appeal, Petitioner did not raise a perjury claim or claim that the prosecution relied on false testimony.[5] *See Salgado*, 2024 WL 5244386, at *3. "Because [Petitioner] never raised the perjury issue at trial or direct appeal, he must show cause and actual prejudice, [or actual innocence,] or else his waiver will not be excused." *Biberfeld*, 957 F.2d at 104 (citing *McCleskey*

---

[5]    Petitioner did unsuccessfully move for a judgment of acquittal or for a new trial on the grounds that the "Government acted in bad faith" because "the only evidence regarding his involvement was his admission but this was never recorded or memorialized." *Nwokedi*, 2016 WL 7015626, at *4 (citing Crim. No. 15-177, D.E. No. 46 at 6–11); *see also Nwokedi*, 710 F. App'x at 93–94 & n.2 (rejecting Petitioner's claims that "his conviction cannot stand because the Government acted in bad faith" by "fail[ing] to record his confession" and that the absence of a recorded confession meant the evidence was insufficient to support his conviction). At his sentencing hearing, Petitioner also continued to protest his innocence and complain about the failure to record the confession, and this Court observed there was no reason to doubt the jury's findings or the special agent's testimony. (12/8/16 Tr. at 15:22–20:18). Neither party asserts that the Petitioner raised (or that this Court and the Third Circuit disposed of) the "false testimony" claim alleged in Petitioner's Amended Motion. In fact, if Petitioner's current claim had been decided, he would be barred from relitigating the disposition on collateral review. *See DeRewal*, 10 F.3d at 105 n.4.

*v. Zant*, 466 U.S. 467, 493–95 (1991), *superseded by statute on other grounds as stated in Banister v. Davis*, 590 U.S. 504 (2020)).  "[A] defendant's knowledge of perjury coupled with his ability to act on it at trial is fatal to a § 2255 claim."  *Id.* (addressing *Brown v. United*, 556 F.2d 224 (3d Cir. 1977)).

Petitioner indicates that he could not raise the "false testimony" claim on direct appeal because "[t]he evidence of the government misconduct was dehors the record" and that the issue requires "expansion of the record, and, as such, [is] only appropriately raised in a post-conviction motion."  (Am. Mot. at 5, 11 (citation omitted)); *Biberfield*, 957 F.2d at 104 ("We hold that if a § 2255 movant can show that the factual basis for a perjury claim was not reasonably available to him or his counsel at trial, he has made a sufficient showing of cause to raise the perjury issue for the first time on collateral attack." (citing *McCleskey*, 499 U.S. at 493–95)).  However, the evidence Petitioner cites in support of his claim was either presented as evidence at trial or, at least, was available to him at the time of trial.

Petitioner acknowledges that "[t]he USAM [i.e., the DOJ *Criminal Resources Manual*], Cole memorandum [i.e., the May 12, 2014 DOJ Memorandum], and DEA slang manual were all available to Trial Counsel had he only engaged in the most cursory of trial preparation."  (Am. Mot. at 43).  In fact, Special Agent Danchuk admitted on cross-examination that he did not take any notes of the interview with Petitioner or have Petitioner "write any of this down," nor did he receive any specific training in taking written statements from a defendant.  (12/9/15 Tr. at 160:20–21, 166:17–168:14).  According to the special agent, while the interview room itself was not set up for audio or video recording in January 2014 when Petitioner was questioned (although the room was now set up with such equipment), the agents did possess the equipment to record the interview (and, in fact, they recorded Petitioner's phone call to Chuks).  (*Id.* at 166:20–169:20).

18

The special agent likewise acknowledged that it would have been helpful to have an audio or video recording of "just what" Petitioner said and that "[i]t would be hard to contest it [the confession] if you were on audio or video confessing." (*Id.* (further testifying that he possibly testified in other cases where the defendant claimed they never confessed)). Special Agent Danchuk referred to the same 2014 DOJ policy change cited by Petitioner, which was implemented after he questioned Petitioner and (for the first time) required interviews to be recorded:

> At that time it wasn't a requirement. It was the Department of Justice policy [that] went into effect about a year ago for us and we had to modify our requirements. Up until that time for my entire career, 27 years, I had not recorded it, it was not a requirement, and we did not record. I have never recorded a custodial interview.

(*Id.* at 168:16–22).

Petitioner also relies on alleged inconsistencies and deficiencies in the special agent's trial testimony (for example, Special Agent Danchuk allegedly "tripped on his fanciful description of what Nwokedi said about Tony"), which were not "dehors" the record. (Am. Mot. at 39). In addition, Petitioner testified that "[m]arket is, it is like, market is item, item, [] market," "[g]oods," or "[t]hings to sell" (12/10/15 Tr. at 22:17–23), and, according to the PSR, "Nwokedi's parents were queen and king of a 'market' in Nigeria" (Am. Mot. at 40 (quoting PSR ¶ 61)).

However, Petitioner failed to raise the perjury issue on appeal and has not otherwise shown actual prejudice or actual innocence. Accordingly, Petitioner's claim is procedurally defaulted, and he fails to provide grounds for excusing the default.[6]

In any event, even if the Court were to conclude that Petitioner's claim that Respondent

---

[6]     "Ineffective assistance of counsel can satisfy the 'cause' element of the procedural default inquiry, *see United States v. Mannino*, 212 F.3d 835, 840 (3d Cir. 2000), but claims of ineffectiveness must rise to the level of constitutional deprivation under the test announced in *Strickland v. Washington*, 466 U.S. 668 (1984)." *Salgado*, 2024 WL 5244386, at *3. Here, the Court concludes that any ineffectiveness claim would fail for the reasons stated in Sections III.B.–C, *infra*. Furthermore, there is no indication that Petitioner can prove his actual innocence.

proffered false testimony were not procedurally defaulted, or were to excuse the default, Petitioner's claim that Respondent presented false testimony is without merit.  Petitioner relies on the absence of any recording or memorialization of the post-arrest interview, evidence regarding the true meaning of the term "market" in Nigerian culture, and alleged inconsistencies and deficiencies in Special Agent Danchuk's overall testimony.  (Am. Mot. at 36–42).  But it is well established that "a '[d]iscrepancy [in witness testimony] is not enough to prove perjury. . . [as there] are many reasons testimony may be inconsistent; perjury is only one possible reason.'" *Seabrooks v. Warren*, No. 13-3703, 2022 WL 4132490, at *9 (D.N.J. Sept. 12, 2022) (alterations in original) (quoting *Lambert*, 387 F.3d at 249), *certif. of appealability denied by* No. 22-2910, 2023 WL 7140516 (3d Cir. Apr. 19, 2023); *see also Desrosiers v. Royce*, No. 21-11491, 2023 WL 7180265, at *24 (D.N.J. Nov. 1, 2023) (same).

In fact, both this Court and the Third Circuit have already considered similar claims challenging the necessity of recording the post-arrest interview and the veracity of the special agent's testimony.  Denying his motion for an acquittal or a new trial, the Court rejected Petitioner's claim that Respondent acted in bad faith by failing to "record[] or memoraliz[e]" Petitioner's admission, explaining that "Nwokedi points to no authority—nor is the Court aware of any—requiring that the Government's post-arrest statement be recorded by video or audio." *Nwokedi*, 2016 WL 7015626, at *4–5.  In its ruling on direct appeal, the Third Circuit concluded that, "[e]ven had Nwokedi timely objected, his bad faith argument would have failed" because "[w]e have no per se rule requiring confessions to be recorded."  *Nwokedi*, 710 F. App'x at 93 & n.2 (citing *United States v. Tykarsky*, 446 F.3d 458, 477 (3d Cir. 2006)).

Similarly, both the Third Circuit and this Court concluded that there was sufficient evidence to support the conviction.  As the Third Circuit explained, "although the jury was free to

believe Nwokedi's testimony that he never confessed, the jury was equally free to find the agent's testimony to the contrary more credible." *Id.* at 94; *see also Nwokedi*, 2016 WL 7015626, at *5 ("After all, to find otherwise would be tantamount to setting aside the jury's consideration of Nwokedi's post-arrest confession that HSI Special Agent Danchuk recounted in his testimony and accepting Nwokedi's assertion that this agent lied, as well as setting aside the circumstantial evidence involving Nwokedi's numerous communications about the parcel-at-issue and efforts to coordinate delivery of this parcel." (citations omitted)).  At his sentencing hearing, Petitioner proclaimed his innocence, asserted that Respondent failed to pursue Chuks, and questioned why, despite the fact that Petitioner was recorded on numerous occasions, no recording was made of his "supposed confession."  (12/8/16 Tr. at 15:21–18:4).  The Court responded that, given the fact that it is the responsibility of the jury (and not the Court) to "come to a conclusion beyond a reasonable doubt as to guilt and innocence" based on the evidence and having listened to every witness and reviewed the charges and the evidence, "[it] ha[s] no reason to doubt the jury's findings" and, in particular, "no reason to doubt the agent's testimony."  (*Id.* at 18:21–20:23).  According to the Court, Special Agent Danchuk was "incredibly credible," and he was not "really . . . touched in terms of cross examination."  (*Id.* at 19:18–21).

Considering Petitioner's present claim for collateral relief, the Court similarly concludes that, "although Petitioner *believes* [Special Agent Danchuk] testified falsely, he has shown no such thing."  *Seabrooks*, 2022 WL 4132490, at *9.  "Nothing Petitioner has provided shows that [Special Agent Danchuk] actually gave false testimony, as opposed to testimony with which Petitioner disagrees . . . . Petitioner was free, [as he did by, among other things, denying on the witness stand that he confessed to the criminal conduct and, through his trial counsel, cross-examining the special agent], to dispute aspects of [the special agent's] testimony and express his

21

disagreement with or disbelief of [the special agent's] testimony, but that does not render [the] testimony false." *Id.*; *see also Boyd v. United States*, No. 13-2587, 2016 WL 8692850, at *3 (D.N.J. Apr. 8, 2016) ("Here, all Boyd offers as evidence of perjury are conflicting testimonies from different witnesses. 'Mere inconsistencies in testimony fall short of establishing perjury and most certainly do not establish that the government knowingly utilized perjured testimony.'" (quoting *United States v. Thompson*, 117 F.3d 1033, 1035 (7th Cir. 1997)).

Petitioner also fails to point to any authority in his Amended Motion requiring that the post-arrest interview be recorded or memorialized. On the contrary, Petitioner admits that the May 12, 2014 DOJ Memorandum did not go into effect until after his arrest. (Am. Mot. at 37 n.8). With respect to the DOJ *Criminal Resources Manual*, the document merely recommended that, "[a]lthough not required, generally speaking, witness interviews should be memorialized by the agent." (DOJ *Crim. Res. Manual* § 165 (emphasis added)). Similarly, the cases cited by Petitioner did not consider a collateral challenge to a criminal conviction based on the theory that an agent testified falsely because he did not record or document a post-arrest statement. *See United States v. Bryant*, No. 12-20276, 2016 WL 8732411, at *16 (S.D. Fla. Oct. 27, 2016) ("Under FBI policy, it is improper for an FBI agent to obtain use of vehicles and money from a source. Detective Tyson was required to file the FBI-302 report in connection with his trip to Miami. He did not file the FBI-302 report until November 7, 2012, approximately five months later."), *R&R adopted by* 2016 WL 8737353 (S.D. Fla. Dec. 16, 2016), *aff'd*, 780 F. App'x 738 (11th Cir. 2019); *United States v. Scrushy*, No. 05-0119, 2012 WL 204159, at *12 (M.D. Ala. Jan. 24, 2012) (noting, in connection with claim that government failed to turn over additional "302s," that the government disputed the petitioner's "number" and "asserts that it only created an interview memorandum when a meeting with Bailey led to new information."), *aff'd*, 721 F.3d 1288 (11th Cir. 2013); *Hatim v. Obama*,

677 F. Supp. 2d 1, 8 & n.4 (D.D.C. 2009) (stating, in context of concluding that 302s were authentic but rejecting a general presumption of accuracy, that, according to the government, the documents were prepared consistent with FBI requirements to ensure their accuracy), *vacated on other grounds by* 632 F.3d 720 (D.C. Cir. 2011).

In any event, even if Petitioner had presented evidence indicating that Special Agent Danchuk's testimony was false, he does not present any evidence that the Respondent knew about this false testimony. *See Boyd*, 2016 WL 8692850, at *3 ("Even if Boyd can show that Venacio's testimony was in fact false, he also offers no evidence that the prosecution knowingly used such false testimony—unwitting use of perjured testimony does not establish prosecutorial misconduct." (citing *United States v. Connolly*, 504 F.3d 206, 212–13 (1st Cir. 2007)).

Accordingly, because Petitioner's "false testimony" claim is procedurally defaulted and fails on the merits, the Court **DENIES** relief based on Ground One of the Amended Motion.

## B.    Ground Two: Trial Counsel Rendered Ineffective Assistance of Counsel by Failing to Investigate and Interview Witnesses

Next, Petitioner claims that his trial counsel was ineffective because he did not investigate and interview witnesses. (Am. Mot. at 6). Specifically, Petitioner contends that he "told Trial Counsel about the meaning of 'market'" and "identified seven people (including his wife) who could explain about the meaning of the term and about its usage in context." (*Id.* at 42). Furthermore, Petitioner asserts that, despite his requests, his attorney never interviewed Soremekun, who purportedly could have testified that Petitioner was in a near-catatonic state during and after his arrest and that Petitioner continued to protest his innocence after his release and prior to trial. (*Id.* at 42–43). According to Petitioner, Soremekun could have also explained that he continued to do business with Petitioner following the arrest and that Petitioner did not have prior dealings with Chuks or Mary Jane. (*Id.* at 43; *see also id.* at 44–45 (arguing that an

interview with Soremekun, "who was quite willing to talk to Trial Counsel," regarding Petitioner's condition at the time of his interrogation would have disclosed facts showing that the alleged "confession" was unreliable and that Special Agent Danchuk could have misunderstood Petitioner's explanation of making money on the sale of the vehicle to Tony and misconstrued Petitioner's statement that Mary Jane had said "market" (i.e., goods) as a confession of guilt)).

In support of his claim of ineffective assistance of counsel, Petitioner relies on his December 23, 2015 Letter to the Court expressing his disappointment in the representation provided by his trial counsel. In this correspondence, Petitioner alleged that, after he was released from jail, he met with Soremekun. (Dec. 23, 2015 Ltr. at 52). Soremekun allegedly told Petitioner that, while they were both being held following Petitioner's arrest, he was making comments and gestures at Petitioner across the room but Petitioner was "despondent and non-responsive." (*Id.*). Petitioner stated that Petitioner's wife could corroborate the fact that Tony stayed in Petitioner's home, Petitioner did not know either Chuks or Mary Jane prior to being introduced to the two individuals by Tony, who was a long-time client of Petitioner, and that, whenever Chuks or Mary Jane called, Petitioner handed the phone to Tony. (*Id.* at 52, 54). According to Petitioner, "[a] simple interview of Africans buying and selling in the markets could corroborate [that 'market' means "goods" and not drugs]." (*Id.* at 54).

Respondent argues that Petitioner's claim that counsel failing to investigate or interview witnesses is belied by the record, including his trial counsel's own sworn statements regarding the actions he took to defend Petitioner and the reasons why Petitioner's attorney did not contact or call as a witness Soremekun (he was assisting law enforcement agents in investigating and prosecuting Petitioner) or Petitioner's wife (e.g., her testimony was superfluous to, and could

contradict, Petitioner's own testimony).[7]  (Resp. at 26–28).  Respondent also argues that Petitioner fails to show any actionable prejudice on account of his counsel's alleged failures to investigate witnesses.  (*Id.*)

The Court concludes that it need not reach the issue of whether Petitioner's trial counsel provided ineffective assistance to him because Petitioner fails to show that his trial counsel's alleged inaction prejudiced him, and this alone is sufficient to defeat Petitioner's ineffective assistance claim.

In *Strickland*, the Supreme Court set forth a two-part test by which courts must evaluate claims of ineffective assistance of counsel.  First, a petitioner must show that "counsel's performance was deficient," which means that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  Specifically, counsel's performance is deficient if counsel's representation falls "below an objective standard of reasonableness." *Id.* at 688.  In examining the question of deficiency, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  As such, "the petitioner bears the burden of showing that counsel's challenged action was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (citing *Strickland*, 466 U.S. at 688–89).

Next, the petitioner must show that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.  Prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A

---

[7]      Respondent acknowledges that "[a] § 2255 motion, when properly made, can be used to raise a claim of ineffective assistance of counsel."  (Resp. at 14 ("Indeed, the Third Circuit prefers that ineffectiveness claims be brought via § 2255 motions." (citing *DeRewal*, 10 F.3d at 103–04))).

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

With respect to the sequence of the two prongs, "[a] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. Instead, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* Because failure to satisfy either prong defeats an ineffectiveness claim, and it is preferable to avoid passing judgment on counsel's performance, the prejudice prong should be considered first where it is dispositive of the petitioner's claims. *See Love v. United States*, No. 22-2768, 2025 WL 1335554, at *3 (D.N.J. May 8, 2025). The Court follows this course of action to dispose of Petitioner's ineffective assistance claim.

According to Petitioner, trial counsel provided deficient representation by failing to investigate, interview, and call as witnesses Soremekun and "seven people (including his wife)." (Am. Mot. at 42). "To demonstrate prejudice on a failure to investigate claim, a petitioner 'must make a comprehensive showing as to what the investigation would have produced.'" *Frost v. Johnson*, No. 16-2982, 2019 WL 11318339, at *15 (D.N.J. Feb. 28, 2019) (cleaned up) (quoting *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996)). "The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produced a different result." *Id.* "In the § 2255 context, other courts have similarly found that a petitioner needs to provide a sworn statement of fact from the proposed witness regarding what they would have testified to if a § 2255 petitioner is to establish *Strickland* prejudice." *Brodie v. United States*, No. 20-12713, 2023 WL 4362720, at *8 (D.N.J. July 6, 2023) (quoting *Baskerville v. United States*, No. 13-5881, 2018 WL

5995501, at *13 (D.N.J. Nov. 15, 2018)), *certif. of appealability denied by* No. 23-2250, 2023 WL 9184863 (3d Cir. Dec. 6, 2023).

Here, Petitioner does not present a sworn statement from either his wife or Soremekun indicating that they would have testified on Petitioner's behalf consistent with his allegations regarding what they had purportedly said to Petitioner or witnessed in connection with this case. As to the "six" other witnesses, Petitioner does not name these individuals, let alone provide a sworn statement from them, nor does Petitioner indicate as to what they would have testified and/or what information they would have provided. Petitioner also does not state whether any of these proposed witnesses would have been willing or able to testify at his trial. *See Brodie*, 2023 WL 4362720, at *8 (stating that, in the absence of a sworn statement from the prospective expert witness describing his testimony, the court cannot conclude that counsel's failure to call him as a witness prejudiced the petitioner); *Baskerville*, 2018 WL 5999501, at *13 ("In this case, petitioner failed to provide any type of sworn statements from Jamal Baskerville and Jamal McNeil that they would have been willing or able to testify. Given this omission, petitioner's declaration as to what these witnesses would have testified to amounts to speculation that is insufficient to grant him relief, or at a minimum, conduct an evidentiary hearing on this claim with respect to these two witnesses.").

In any case, even if the Court were to assume *arguendo* that the witnesses would have testified in the manner suggested by Petitioner, he still does not show a reasonable probability that the result of his trial would have been different.

First, Petitioner's trial counsel elicited testimony regarding Soremekun's ongoing business relationship with Petitioner, the alleged meaning of "market" in Nigerian culture, and Petitioner's condition when he was arrested and questioned by the agents. On cross-examination, Soremekun

acknowledged that he had known Petitioner for five or six years "through [their] business relationship" and that, after a temporary cessation following the arrest, he continued to do business with Petitioner despite the incident with the parcel-at-issue. (12/9/15 Tr. at 84:22–85:2, 91:8–19). Petitioner testified that "market" means goods to sell. (12/10/15 Tr. at 22:17–23). Petitioner further indicated that he urinated when he was tackled and handcuffed and that he was scared and shivering during the post-arrest interview. (*Id.* at 33:2–34:10).

Second, as the Court suggested in its prior decision denying Petitioner's motions for an acquittal or a new trial and at sentencing, *see Nwokedi*, 2016 WL 7015626, at *4–7; (12/8/16 Tr. at 19:17–19), Respondent presented a strong case against Petitioner. *See Gooding v. Wynder*, 459 F. App'x 83, 86 (3d Cir. 2012) (indicating that a court must consider strength of the evidence of a petitioner's guilt in determining whether he was prejudiced due to counsel's purported ineffectiveness (citing *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999)). Specifically, Special Agent Danchuk testified that, after initially claiming that the parcel-at-issue contained car mirrors he purchased from eBay for a Mercedes Benz he was going to ship to Tony in Nigeria, he changed his story to say that Mary Jane had sent him the package. (12/9/15 Tr. at 140:19–142:3). Petitioner had previously told the same lie regarding car parts to Soremekun. (*See* 12/10/15 Tr. at 31:2–32:14). Once the agents confronted him with the fact that the parcel-at-issue contained heroin, Petitioner changed his story again, confessing that he knew there were drugs (which Mary Jane referred to as "market") in the package, he had agreed to receive the parcel-at-issue, and he was going to be paid $3000 to deliver the parcel to Chuks. (12/9/15 Tr. at 143:18–145:12, 151:16–21).

Furthermore, there were some inconsistencies in Petitioner's testimony at trial. For instance, Petitioner testified on direct examination that he did not know Chuks and that the various text messages and phone calls between Chuks and Petitioner's cell phone were because Tony used

his phone. (12/10/15 Tr. at 17:17–18:9). However, Petitioner later admitted on cross-examination that, from the end of November 2013 through early January 2014 (during which time the parcel-at-issue was shipped from India to Petitioner's business address in Newark and text messages and phone calls were exchanged regarding the shipment), Petitioner (not Tony) was using the device and communicating with Chuks and Mary Jane about the parcel containing drugs. (*Id.* at 41:9–42:7, 67:6–13, 68:11–18).

Given Petitioner's failure to present any sworn statement from his wife, Soremekun, or any other individual, together with the totality of the evidence presented at Petitioner's trial, the Court concludes that Petitioner fails to meet his burden to show that his trial counsel's alleged failure to investigate, interview, and call additional witnesses resulted in prejudice under *Strickland*. Accordingly, the Court also **DENIES** relief based on Ground Two of the Amended Motion.

### C.    Ground Three: Trial Counsel Rendered Ineffective Assistance by Failing to Investigate Defenses

In addition to claiming that his prior attorney provided ineffective assistance by failing to investigate, interview, and call his wife, Soremekun, and several unidentified individuals as witnesses, Petitioner similarly asserts that trial counsel provided constitutionally deficient representation by failing to investigate the DOJ *Criminal Resources Manual*, the May 12, 2014 DOJ Memorandum, and the DEA "slang" manual. (Am. Mot. at 43). According to Petitioner, "phone records in the Government's exhibits (provided to the defense before trial) [were] proof that Chuks had tried to contact [him] the morning after the arrest," and that this was "evidence that suggested that the Government had let the important figure in the investigation slip through its finger, and thus was trying to paint [him] as the guilty party to justify the investigation." (*Id.* at 42). Petitioner purportedly brought these phone records to his attorney's attention during closing argument, but his trial counsel allegedly ignored him. (*Id.* at 42 n.11 (citing Dec. 23, 2015 Ltr.)).

Again, as with Ground Two, the Court agrees with Respondent that Petitioner fails to show prejudice (*see* Resp. at 28–31).

Initially, as the Court has already noted in its discussion of Ground Two, *see supra* Section III.B., trial counsel did raise at least some of the defenses referenced by Petitioner, even if counsel did not do so in the same manner (or with the same emphasis) that Petitioner would have preferred. First, his trial counsel specifically questioned Special Agent Danchuk about his failure to record the post-arrest interview and the policy change announced in the May 12, 2014 DOJ Memorandum regarding such recordings (which went into effect *after* Petitioner was questioned).  (12/9/15 Tr. at 160:20–21, 166:17–169:20).  Second, counsel cross-examined the Special Agent Danchuk about the agents' failure to follow up on Chuks.  (*Id.* at 172:10–174:3).  Although Special Agent Danchuk indicated that Petitioner's phone was monitored and Chuks did not call Petitioner, he also appeared to admit that the device was not monitored "live."  (*Id.*).  Lastly, counsel expressly asked Petitioner about the meaning of the term "market," and Petitioner testified that it means goods for sale. (12/10/15 Tr. at 22:17–23).

The May 12, 2014 DOJ Memorandum establishing a presumption in favor of recording custodial statements did not go into effect until several months *after* Petitioner's arrest and interview, and the DOJ *Criminal Resources Manual* recognized that memorialization of witness interviews is "not required" and merely recommended that, in general ("generally speaking"), such interviews "should" be memorialized.  (*See* Am. Mot. at 37 n.8; DOJ *Crim. Res. Manual* § 165). As the Court has observed, *see supra* Section III.B., Respondent further presented a strong case, which evidence ultimately led the jury to conclude Petitioner was guilty.  Petitioner contends that, according to Chuks's phone call, Chuks would subsequently provide the address to which the parcel-at-issue was to be delivered and that "[t]he fact that the package was to be brought by

Nwokedi to a location specified by Chuks was material to Nwokedi's defense that he was just an intermediary providing a reasonable service for a long-time client." (*Id.* at 26). However, such evidence is also consistent with the prosecution's theory that Petitioner had agreed to receive the parcel-at-issue knowing it contained drugs from Mary Jane and then deliver the drug shipment to Chuks in New York in exchange for $3000. Likewise, even if the term "market" is *not* a customary slang term for drugs, or has a distinct meaning in Nigerian culture, it is, at the very least, plausible for a jury to believe that the co-conspirators in this case used the term amongst themselves as a code word to refer to the illegal drugs being shipped.

Given the totality of the circumstances and the evidence adduced at trial, the Court finds Petitioner fails to show prejudice under *Strickland* because he has failed to establish that the result of his trial would have been different if his trial counsel had done what he claims he should have done. Accordingly, the Court also **DENIES** relief based on Ground Three of the Amended Motion.

### D.    Request for Evidentiary Hearing

Petitioner also requests an evidentiary hearing, specifically on the grounds that "a substantial and material question exists as to whether [Special] Agent Danchuk testified falsely about Nwokedi's confession." (Am. Mot. at 41). According to Petitioner, "[t]he evidence not adduced by trial counsel"—specifically based on the DOJ *Criminal Resources Manual*, evidence that "market" was a common, non-drug term used in Nigeria, and "a complete absence of any basis" for believing that "market" was "drug patois"—together with evidence that the jury heard about the failure to follow up on Chuks and Special Agent Danchuk's lack of clarity on anything relating to the undocumented interview but for "two pieces that fit the Government's case like a glove" —"is more than sufficient to require an evidentiary hearing." (*Id.* at 41–42). However, for the reasons stated above, *see* Sections III.A.–C., the "motion and the files and records of the case

conclusively show" that the movant is not entitled to relief, 28 U.S.C. § 2255(b); *see also Booth*, 432 F.3d at 545–46; *Love*, 2025 WL 1335554, at *3 ("Where the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by the petitioner or indicate[s] that petitioner is not entitled to relief as a matter of law, no hearing is required." (quoting *Judge v. United States*, 119 F. Supp. 3d 270, 280 (D.N.J. 2015)).

### E.    Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Because all of Petitioner's claims are clearly barred or meritless for the reasons expressed throughout this Opinion, Petitioner has failed to make a substantial showing of a denial of a constitutional right.  This Court therefore also **DENIES** a certificate of appealability.

## IV.    CONCLUSION

For the reasons stated above, the Court **DENIES** Petitioner's Amended Motion and **DENIES** a certificate of appealability.  An appropriate Order follows.


Dated: August 28, 2025                    */s/ Esther Salas*
                                          **Esther Salas, U.S.D.J.**